ROBERT K. ABRAHAM and JOAN ABRAHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Abraham v. Commissioner
Docket No. 4146-71.
United States Tax Court
T.C. Memo 1974-19; 1974 Tax Ct. Memo LEXIS 305; 33 T.C.M. (CCH) 81; T.C.M. (RIA) 74019; January 23, 1974, Filed. *305 Harry Margolis, for the petitioners.
Sheldon M. Sisson, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION
SCOTT, Judge: Respondent determined deficiencies in the Federal income tax and additions to tax for petitioners for the calendar years 1967 and 1968 as follows: Year
Deficiency
Addition to Tax Under
Sec. 6653(a) I.R.C.
1954 1967
$17,188
$859
1968
16,480
824 2 Concessions having been made by both parties, the issues for our decision are as follows:
1. For Federal income tax purposes, are the bases of certain properties in the hands of Professional Properties Partnership (PPP) limited to their bases to The Greater West Company (GW), a prior owner of these properties?
2. For Federal income tax purposes, did payments denominated interest made by PPP to World Minerals, N.V., constitute interest on loans or payments in reduction of principal?
FINDINGS OF FACT
Most of the facts have been stipulated. We find the facts with the exhibits as stipulated, and these facts are a part of this opinion to the same extent as if recited herein. We will set forth herein in summary form only those stipulated facts *306 which are necessary for an understanding of this opinion.
Petitioners Robert K. and Joan Abraham are husband and wife and at the time they filed their petition in this case they resided in Encino, California. They filed a joint Federal income tax return for their taxable year 1967 with the district director of internal 3 revenue, Los Angeles, California and a joint Federal income tax return for their taxable year 1968 with the director of the internal revenue service center, Western Region, Ogden, Utah.
T. C. McMillan was a restaurant operator in Oxnard, California at the time of World War II. He became involved in mobile home construction about 1947, and out of this he branched into mortgage financing. Over the next 15 years he built the sixth largest mortgage servicing organization in the United States, McMillan Mortgage Company (McMillan Mortgage), which was located in Los Angeles, California and with offices throughout California.
McMillan Mortgage was incorporated June 6, 1948, as a California corporation. It represented at one time or another all of the major banks in California and approximately 15 major insurance companies and banks located elsewhere in the United *307 States. It administered in excess of $400,000,000 worth of real estate residential loans for such banks and insurance companies. The company was highly successful, earning approximately $1,000,000 a year in 1963.
T. C. McMillan and his family owned in excess of 95 percent of the stock of McMillan Mortgage during 4 its entire existence. The mortgage company merged with Fidelity Bank in 1964 and T. C. McMillan became an officer of Fidelity Bank and its largest shareholder. The bank stock was in a voting trust so that McMillan and his family had no real control and no power to sell more than 2-1/2 percent of the stock in any year. The voting trust runs until 1985. The fair market value of the stock dropped substantially in value after 1965.
T. C. McMillan owned and operated more than 60 corporations in the decade prior to 1965. One of these, Pacific Lenders, Inc. (Pacific Lenders), was a California corporation formed July 10, 1952, principally by T. C. McMillan; Frank L. Frain, the financial vice president of North American Aviation; H. P. Skoglund, president of Insurance Company of North America; and Martin V. Smith, a restaurant owner, land developer and financier.
Pacific *308 Lenders was engaged in land development with major projects in Palm Desert, Santa Maria, Lancaster, Fresno, Folsom and elsewhere in California, and in Reno and Sparks in Nevada. Pacific Lenders was also involved in oil investments and the sale and rental of commercial and residential property. 5 Pacific Lenders acquired vacant land in Santa Maria, California on or about January 1, 1961. Santa Maria is in the vicinity of, and its economy depends upon, Vandenberg Air Force Base. Title to the vacant land was taken in the name of a wholly owned subsidiary, Stowell Manor, Inc. Pacific Lenders proceeded to build a shopping center with the key store being a J. C. Penney store. The Santa Maria Shopping Center (SMSC) was built over a period of 2 years and was completed in 1963. Two additional major tenants were added in 1964. The SMSC was fully occupied in late 1965. The first full year of operation was 1966. The SMSC was the largest single project of its type undertaken by Pacific Lenders.
The cost of construction of SMSC was $1,727,328 for the first section and $994,397 for the second section. In addition, furniture and fixtures cost $96,869, office furnishings cost $577, *309 a vacuum cleaner cost $367, a power sweeper cost $2,728, and an old truck cost $250, for a total cost to Pacific Lenders for the SMSC of $2,913,665. [1] 6 Pacific Lenders borrowed $800,000 from Southwest Capital Company (Southwest Capital) on November 30, 1961, and $2,400,000 from Prudential Insurance Company shortly thereafter, and $72,000 from United California Bank, so that the borrowings totaled $3,272,000 or $358,335 more than the cost of the property fully improved to Pacific Lenders.
Pacific Lenders had a policy of borrowing heavily on all of its assets and acquiring unimproved real property with the funds so produced. This ultimately proved its downfall because the interest burden from unimproved real properties accumulated faster than Pacific Lenders was capable of financing development.
Pacific Lenders suffered general economic reverses in 1964 and 1965 and Southwest Capital commenced foreclosure on the SMSC in 1965. Pacific Lenders sought a reorganization under Chapter 11 of the Bankruptcy Act in 1965. Numerous attempts were made by Pacific Lenders to *310 dispose of SMSC, but no buyer was willing to put up the $750,000 cash that was required to clear Southwest Capital.
There were a number of prospective purchasers in 1965 and 1966. Sales for prices up to $3.5 million were negotiated but never consummated. In 1966, when it appeared that SMSC would be sold at foreclosure, 7 The Greater West Company (GW) proposed that it, the owner of 36.9 percent of Pacific Lenders stock, would purchase SMSC for $3,100,685. GW would waive all rights to any participation in the proceeds of the bankruptcy of Pacific Lenders, then valued in its entirety at $400,000. GW's offer was accepted by Pacific Lenders in December 1966 and approved by the Bankruptcy Court on February 24, 1967, to be effective as of February 1, 1967. GW paid Pacific Lenders $682,000 down in cash and the balance by assuming outstanding obligations to Prudential Insurance Company, United California Bank, and Security Title Insurance Company. GW had to borrow $597,000 to be able to tender a cash downpayment of $682,000. This loan was subsequently repaid with interest upon the dissolution of GW.
GW, the corporation which purchased SMSC from Pacific Lenders, was incorporated *311 on April 9, 1951, in the State of California. Its sole shareholder was T. C. McMillan who remained the exclusive shareholder until December 15, 1965.
GW, from its inception, had been an operating real property developer. In addition to being the principal shareholder of Pacific Lenders, GW was involved in other projects in Santa Maria, California, 8 including being a general partner in a partnership that built and sold several hundred residences and commercial properties. GW was a 30-percent partner in Oxnard Industrial Development Company which, with related corporations, owned industrial real property and a railroad located in Ventura County, California of a total value in excess of $3,000,000. GW was also involved in real estate construction projects in Marysville, California; Santa Clara County, California; Palm Desert, California; and in Colorado.
GW was directly managed by employees under the supervision and control of T. C. McMillan on the premises of McMillan Mortgage. Following the merger of McMillan Mortgage and Fidelity Bank, GW moved its principal offices across the street from the mortgage company. In that office, under the direct supervision and control of *312 Charles H. Meacham, the financial consultant to T. C. McMillan, more than 20 McMillan Mortgage employees were engaged in the management and liquidation of those assets of the mortgage company which were not involved in the merger with Fidelity Bank.
As a prerequisite to the merger of McMillan Mortgage into Fidelity Bank, approximately $30,000,000 worth of assets and related liabilities had to be removed from the mortgage company and separately 9 operated in accordance with a ruling from the Internal Revenue Service. In the course of the operation and disposition of these separated assets it was discovered that they operated at a net loss in excess of $100,000 per month.
GW, in concert with other T. C. McMillan enterprises, sought to develop maximum cash beginning in early 1965 in order to meet the cash needs involved in the liquidation of the McMillan Mortgage assets which were omitted from the Fidelity Bank merger.
On December 15, 1965, T. C. McMillan disposed of a large block of his assets, including his GW stock, to the Aruba Bonaire Curacao Trust Company (ABC) as trustee of two family trusts providing him with a private foreign situs annuity. ABC almost immediately commenced *313 the liquidation of all of the assets it received in order to acquire cash that was sorely needed as a result of the mortgage company merger with Fidelity Bank.
From December 15, 1965, management of GW continued unchanged in Meacham and employees directed by him. While ABC owned the stock, the day-by-day operations of GW were not closely supervised by ABC.
In late 1966, ABC decided that GW should be dissolved, this decision having been reached on the advice 10 of T. C. McMillan, Charles H. Meacham and those familiar with the overall cash requirements and the properties involved. Such dissolution commenced in January of 1967. GW distributed SMSC in the course of its liquidation to its sole shareholder, the two McMillan family trusts, for which ABC was trustee. The McMillan trusts sold SMSC to Professional Properties Partnership (PPP) on April 1, 1967. PPP has owned SMSC continuously since April 1, 1967.
The terms of the sale of SMSC to PPP were as follows: Elaine B. Fischel, acting solely in a capacity of trustee [agent] for ABC conveyed SMSC to PPP [Buyer] upon Buyer's taking subject to a deed of trust in favor of Prudential Insurance Company in the amount of $2,337,762.23, *314 and taking subject to a deed of trust in favor of the United California Bank in the amount of $35,853.07. Furthermore, Buyer assumed obligations to Security Title Insurance Company in the sum of $23,721.24 and to certain lessees of SMSC in the amount of $6,802.50. PPP also executed a promissory note to ABC in the amount of $1,651,729.75. The note read as follows: 11 PROMISSORY NOTE
$1,651,729.75 Los Angeles, California April 1, 1967 Five (5) years after date, for value received, we promise to pay to ARUBA BONAIRE CURACAO TRUST COMPANY LIMITED, at its Nassau, Bahamas Office, One Millian [sic], Six Hundred Fifty One Thousand, Seven Hundred Twenty Nine Dollars and 75/100 ($1,651,729.75), with interest payable quarterly at the rate of ten (10%) percent per annum from April 1, 1967, until paid, and reasonable attorney's fees in the event any default occurs hereunder and this note is placed in the hands of an attorney for collection. Should the interest not be paid when due, the whole sum of principal and interest shall, at the option of the holder of this note, become immediately due and payable.
The makers and endorsers of this note hereby waive diligence, demand, presentment, *315 protest and notice.
PROFESSIONAL PROFESSIONAL presentment, protest and notice.
PROFESSIONAL PROPERTIES
PARTNERSHIP
BY: CAMPBELL ASSOCIATES, INC.
Managing Partner
By: /s/ Paul W. Campbell PPP was formed on April 1, 1967, to be a real property development and investment partnership. PPP was organized by several attorneys and certified public accountants who were acquainted with or had represented T. C. McMillan and GW. PPP was formed to constitute for its members a hedge against inflation with the prospect of long-term capital gains, with current prepaid interest and accelerated depreciation income tax 12 deductions and for maximum leverage. As of the end of 1967, PPP consisted of 17 partners and its initial capital contributions in 1967 were $402,500. Neither PPP nor any of its partners had at any time any direct or indirect ownership interest in GW. GW did not at any time have any direct or indirect ownership interest in PPP. None of the partners in PPP were related to each other in any way, although some were previously acquainted.
None of the PPP partners were professionally involved in land development or management; however, most of the PPP partners had been *316 involved in similar real property investments prior to PPP. The management of PPP has at all times been placed with professionals employed by PPP for that purpose. These have included two California corporations engaged in land management and development, Campbell Associates, Inc., and The Maryelle Corporation, and two individuals, Elaine B. Fischel and Harry Margolis.
Petitioner Robert K. Abraham is a partner in PPP. He is a physician specializing in opthalmology. In 1967 he joined PPP by contributing $25,000, all of which he borrowed from Anglo Dutch Capital Company (ADC). In 1968 he again contributed $25,000 to PPP, 13 of which amount $15,000 was derived from personal funds and $10,000 from an additional loan from ADC. Petitioner Abraham has repaid with interest those amounts he borrowed from ADC.
ADC is a California corporation which was acquired in late 1966 by Harry Margolis and an associate. ADC borrows substantial sums and relends such sums almost exclusively to Margolis's clients. The activities of ADC from 1967 through the present have involved outstanding loans in excess of $15 million.
The following schedule lists the partners of PPP, their contributions *317 to PPP in 1967 and 1968, together with the portion of each contribution which was borrowed from the Anglo Dutch Capital Company (ADC), and the occupation of each partner: 14 Partner
Occupation
Contribution
Portion
Contribution
Portion
to PPP in
Borrowed
to PPP in
Borrowed
1967
from ADC
1968
from ADC
Robert K. Abraham
Physician
$ 25,000
$ 25,000
$ 25,000
$ 10,000
S. K. Abul-Haj
Physician
30,000
-0-
30,000
[1] 15,000
Charles Adams, Sr.
Auctioneer
15,000
15,000
15,000
15,000
Donald Byrnes
Physician
10,000
-0-
34,000
-0-
Harry J. Cohen
Pharmacist
12,500
10,000
-0-
-0-
Michael Donner
Lawyer
5,000
-0-
-0-
-0-
James L. Jones [2]
Physician
20,000
20,000
15,000
15,000
Adolph Koven
Lawyer
10,000
8,500
10,000
10,000
Richard Lemon
Executive
15,000
15,000
-0-
-0-
Thomas Logan
Retired
10,000
-0-
-0-
-0-
Harold M. Plant
C.P.A.
20,000
-0-
10,000
-0-
Frank Ruys
Physician
30,000
[1] 20,000
30,000
15,000
Richard Rykoff
Lawyer
15,000
15,000
15,000
15,000
William Sennett
Executive
135,000
-0-
-0-
-0-
Harry J. Sherman
Physician
20,000
11,000
10,000
10,000
Edward O. Thorp
Mathematic
20,000
-0-
20,000
20,000
ian
Genevieve Torgan
Hospital
10,000
-0-
-0-
-0-
Admin.
TOTALS,
$402,000
$139,500
$214,000
$125,000
*318 15 PPP acquired the following properties which had previously been owned by, or in one instance was under option to, GW:
a. Palm Desert Residence - A single family residence located in Palm Desert, California. GW acquired it from Pacific Lenders in 1963 for approximately $30,000. The residence was occupied by Edna McMillan, the mother of T. C. McMillan, who was then in her late 80's. PPP agreed that Edna McMillan could remain in the residence for the remainder of her life. Edna McMillan died two years after PPP purchased the property and PPP shortly thereafter sold the property to a person named Nelson.
PPP acquired the Palm Desert residence by issuing a note to ABC for $13,301.58 and by assuming the outstanding trust deed to California Federal Savings and Loan Association of $26,698.42, for a total cost of $40,000. PPP sold the property for $45,000 on January 9, 1970.
b. Sonoma Land - A parcel of unimproved commercial property located in the City of Santa Rosa, California. GW acquired this land in 1964 for the amount of $60,000 cash. PPP acquired the property from GW on April 1, 1967, for $80,000 *319 with no downpayment. PPP later 16 exchanged this property for seven parcels of improved and unimproved real property.
c. Mendocino Land - Property located in Mendocino County in northern California which was entirely unimproved mountain and forest property when GW acquired it from Henry Knivala on September 21, 1966, for $105,200. PPP acquired this property from GW on April 1, 1967, for $190,000 with no downpayment. PPP thereafter improved one of the parcels by constructing a rental facility which cost PPP $30,724.52. On January 12, 1970, PPP sold the improved parcel for $40,000 and shortly thereafter sold the remainder of the property for $175,300.
d. As heretofore stated PPP acquired from GW, SMSC which had been acquired by GW from Pacific Lenders. SMSC was not of particularly good design and the construction was of poor quality materials which were drab and unimaginative at a time when shopping centers of this size were developing inviting new forms of architecture and decoration.
SMSC earned approximately $425,000 gross profit and $325,000 net profit in the calendar year 1966. The amount of earnings for 1966 was not precisely 17 known at the time GW acquired *320 SMSC because the rent due from the J. C. Penney store in the SMSC is 3 percent of that store's monthly profit, with no minimum rental, and the rent for December 1966 had not been reported. Since 1966 the annual operating income of SMSC decreased slightly so that it was down from 1966 by approximately $25,000 in 1967, $40,000 in 1968, $25,000 in 1969 and 1970, and $40,000 in 1971. Taxes and expenses have increased slightly so that the net income has been further decreased on an average of $15,000 per year.
Shopping center property with a major group of tenants such as J. C. Penney, Thrifty Drug Company and Thrifty Mart was normally valued from a high of 13 to a low of 11 times net earnings in 1967. On the basis of net earnings and using the above formula, SMSC had a fair market value of $3,575,000 to $4,225,000 in the spring of 1967, and as of the spring of 1971 had a value of $3,135,000 to $3,505,000.
Pacific Lenders had its own employees who managed SMSC so long as Pacific Lenders owned SMSC. The principal such employee was Philip Selness who acted under the principal direction of T. C. McMillan. Following February 1, 1967, the date of the conveyance of 18 SMSC from Pacific *321 Lenders to GW, SMSC was managed by Campbell Associates, Inc., which was headed by Paul Campbell, a former employee of McMillan Mortgage. Campbell Associates, Inc., managed SMSC for PPP for several months after PPP acquired SMSC on April 1, 1967. Elaine B. Fischel and her wholly-owned corporation, Maryelle Corporation, assumed the management of SMSC for PPP about September 1967 and continued to manage SMSC until early 1970. Since that time the office of Harry Margolis in Saratoga, California, has managed SMSC for PPP.
e. Gould Heights - A lot in Fresno, California, which GW acquired in early 1967 for $32,000. PPP purchased the lot on April 1, 1967, for $32,000. No downpayment was made; PPP assumed an outstanding balance on the property of $22,000 and set up an account payable to ABC of $10,000. PPP sold this property on September 10, 1967, for $35,000.
f. 1317 S. Gramercy - A residence located in Los Angeles. GW purchased the property on September 29, 1966, for $40,000, of which $8,000 was cash and the balance a note secured by a deed of trust.
GW renovated the property and leased it to Nator, Inc., which was operating a convalescent hospital 19 where Genevieve Torgan, *322 one of the PPP partners, was administrator. This was a 5-year lease at $700 per month. GW sold the property to PPP on April 1, 1967, for $68,752.24. The purchase price consisted of PPP's assumption of a note payable to a prior owner in the amount of $29,871.73, PPP's issuance of a new note payable to ABC in the amount of $30,128.27, and the cash payment of $8,752.24. PPP sold this property on October 1, 1969, for $86,000.
g. The Gables - An apartment house in Marin County, California which was acquired by GW on January 1, 1967, for $204,179.40. PPP acquired this property from GW on April 1, 1967, for $230,000 which was represented by PPP's assumption of a First Savings and Loan obligation of $189,429.40, a note with a second deed of trust to Esther Warshaw of $14,750 and a note to ABC in the amount of $25,820.60. PPP sold the property on November 30, 1967, for $220,000 in which the buyer assumed the balance of the First Savings and Loan obligation and furnished the remainder of the purchase price in cash. 20 h.Fountain Avenue. This is a residence in Los Angeles which was converted into an office building in 1960. GW entered into an escrow to acquire this property *323 on March 13, 1967, for $127,500 from Medio Investment Company. GW had planned to purchase the property in 1966 and was morally committed to complete the purchase.
GW assigned its rights to this property in escrow to PPP. GW received no consideration for the assignment, and PPP closed the escrow on June 5, 1967, on the exact terms and conditions agreed to by GW. PPP paid $46,906.01 cash, of which $150.27 was thereafter refunded. The balance of the purchase price of $127,500 was represented by the assumption of a note with a balance of approximately $80,000. PPP sold the property on October 15, 1969, for $119,869.
The total amount of the promissory notes drawn by PPP to ABC in connection with the acquisition of the above-described properties was $2,077,857.66.
ABC acted solely as a trustee in acquiring GW from T. C. McMillan. Moreover, ABC acted solely as 21 trustee in receiving proceeds from the sale of the GW properties.
ABC is a licensed Bahamian trust company which was incorporated in 1963 by Sir Guy Henderson who now serves as its counsel. The sole shareholder of ABC was and is Koningsplein, N.V., a Netherlands Antilles corporation. The sole owner of Koningsplein, *324 N.V., is W. M. J. Alvares Correa, a Netherlands Antilles lawyer.
While ABC occupied its own quarters in Nassau in the Bahamas, its board of directors and chief officers were located in Curacao. ABC's Curacao offices and management were under the control and direction of a very large international firm belonging to A. A. G. Smeets and W. M. J. Alvares Correa. The Smeets-Correa organization managed hundreds of corporations, including a large number of very substantial size, one of these corporations being World Minerals, N.V. (WM), a Netherlands Antilles corporation. 22 Over a period of years WM regularly acquired unsecured loans from ABC for its own account. These transactions occurred because of the favorable tax laws in the Netherlands Antilles vis-a-vis the Bahamas. ABC sold the promissory notes it received from PPP to WM, prior to June 30, 1967. The reason for this transfer was ABC's inability to receive interest on such receivables free of United States taxation while WM was not so hampered. The cash which ABC received was loaned to T. C. McMillan's cash-short corporations.
PPP paid WM $365,246 in payment of principal and $210,000 in payment of interest in 1967. *325 PPP paid WM the $210,000 interest on December 28, 1967, and allocated such interest on the books of PPP pro rata to all sums owed by PPP to WM during 1967. During 1968, PPP paid WM $113,482 in payment of principal, thus reducing the balance of the principal due to WM to $1,599,129.41. During 1968, PPP paid WM interest in the amount of $270,272.
The indebtedness owed by PPP to WM in connection with the GW properties acquired from ABC was fully paid with interest as of the end of 1971. PPP borrowed $2.1 million from California Care Corporation 23 on December 14, 1971. Part of this loan was used to retire the WM loan. PPP now owes $1,934,799.37 to California Care Corporation. All of the shares of California Care Corporation are held by ABC as trustee. PPP and California Care Corporation were at all times unrelated in any way though they had prior business transactions.
T. C. McMillan had no connection of any kind with PPP other than as appears in these findings of fact. PPP and its partners had no ownership interest of any kind in McMillan Mortgage, Pacific Lenders, Inc., GW, the McMillan family trusts, or any other T. C. McMillan enterprise. The transfer of assets by *326 T. C. McMillan to ABC in 1965 in return for a private family annuity did not involve PPP in any way.
Elaine B. Fischel is a California attorney. She and Harry Margolis were partners during 1966 and 1967. She has represented several of the partners of PPP. She was appointed by ABC to be its trustee in disposing of the assets of GW in 1967. She had no ownership interest in GW or in PPP. She managed PPP from September 1967 until early 1970 through her wholly-owned company, the Maryelle Corporation. 24 Harry Margolis is also a California attorney. He served as tax counsel for T. C. McMillan from 1960 until 1968. He also served as tax counsel to GW with Elaine B. Fischel. In connection with the formation of PPP and its purchase of properties from ABC for the benefit of GW, Margolis and Fischel represented GW and advised all prospective PPP partners to obtain independent advice before joining PPP. At one time or another, Margolis has acted either as tax counsel or consultant for all of the partners in PPP. Margolis has carried out the management of PPP and of the SMSC since 1970. Margolis and an associate are the owners of ADC. Margolis did not represent McMillan Mortgage *327 or Pacific Lenders, although he did assist in the final phases of the bankruptcy proceedings as a professional courtesy and without fee.
PPP filed a Partnership return for its taxable period April 1, 1967, to December 31, 1967, reporting an ordinary loss of $405,329. It deducted from its total income the amount of $367,219 as interest payments and the amount of $168,161 as depreciation. Included in the interest which PPP deducted was the $210,000 it paid to World Minerals, N.V. 25 PPP filed a Partnership Return for its taxable year 1968 reporting an ordinary loss of $404,105.16. It deducted from its total income the amount of $478,051 as interest payments and the amount of $201,121 as depreciation. Included in the interest which PPP deducted was the $270,271.75 it paid to WM.
In computing its depreciation deduction for 1967 and 1968, PPP claimed as a basis for some of its various properties the following amounts: Santa Maria Shopping Center
Land
$ 850,000
Buildings, Improvements & Fixtures
3,208,277
Equipment
8,100
Total
$4,066,377
Fountain Avenue
Land
$ 45,000
Building
82,500
Total
$ 127,500
Palm Desert Residence
Land
$ 6,684
Building
33,316
Total
40,000
1317 South Gramercy
Land
$ 30,000
Building
30,000
Furniture & Fixtures
8,752
Total
$ 68,752
*328 Petitioners Robert K. and Joan Abraham reported their distributable net loss from Robert's interest 26 in PPP as $25,000 for their taxable year 1967 and $25,000 for their taxable year 1968.
Respondent determined that an examination of PPP for the years 1967 and 1968 results in distributable net income to Robert K. Abraham rather than the distributable net losses claimed on his returns for his taxable years 1967 and 1968. The net income determined by respondent for PPP in 1967 results in part from respondent's disallowance of the $210,000 claimed as an interest expense paid to World Minerals, N.V., because of PPP's failure to establish (1) that an indebtedness was incurred; (2) that the amount claimed as interest expense was paid; and (3) that the transaction giving rise to the indebtedness should be recognized for tax purposes. For these same reasons, respondent disallowed PPP's deduction of $270,272 claimed as interest paid to World Minerals, N.V., in 1968.
Respondent also determined that PPP's depreciation deduction was excessive for 1967 and 1968 because PPP failed to establish (1) that either the partnership or the partners are the equitable or beneficial owners of *329 all of the property, and (2) that the bases claimed 27 for the property should be recognized as bona fide for tax purposes, or (3) that the amount claimed represents a reasonable depreciation allowance. On brief respondent concedes that the claimed depreciation was not excessive as to certain properties, leaving in issue with respect to depreciation only SMSC, the Palm Desert residence, and the Gramercy Building.
Finally, respondent determined that part of petitioners' underpayment of tax is due to negligence or intentional disregard of rules and regulations. Consequently, respondent has asserted an addition to tax under section 6653(a), I.R.C. 1954. [2]
OPINION
Respondent contends that none of the payments made by PPP to World Minerals, N.V., in 1967 and 1968 constitute interest on an indebtedness but rather represent a disguised downpayment of the principal amount of the purchase price of the properties and that accordingly such payments may not be deducted from PPP's total income for each of the years in issue. Respondent further contends that PPP has used artificially inflated bases *330 on certain of the properties for purposes 28 of determining depreciation deductions for 1967 and 1968. He determined that the proper tax base for depreciating these improved properties acquired by PPP from ABC on April 1, 1967, is as follows: Cost or Other Basis
Description
Date
As Claimed by
As Determined
Acquired
Petitioners
by Commissioner
Santa Maria Shopping Center
4-1-67
Land
$ 850,000
$ 872,000
Buildings, Improvements & Fixt.
3,208,277
2,220,585
Equipment
8,100
8,100
Total
$4,066,377
$3,100,685
Palm Desert Building
4-1-67
Land
$ 6,684
$ 4,458
Building
33,316
22,240
Total
$ 40,000
$ 26,698
Gramercy Building
4-1-67
Land
$ 30,000
$ 18,960
Building
30,000
18,960
Furniture & Fixt.
8,752
2,080
Total
$ 68,752
$ 40,000
Finally, respondent contends that the petitioners intentionally disregarded rules and regulations by deliberately distorting their income by claiming a basis for depreciation in excess of true cost and by deducting as an interest expense an amount which constitutes principal. 29 Respondent contends that PPP acquired real estate to serve as a tax shelter *331 for its partners by purchasing a shopping center which Pacific Lenders desperately needed to sell to stave off a foreclosure sale and possible bankruptcy. Respondent argues that rather than have Pacific Lenders sell SMSC to PPP, Harry Margolis, representing both PPP and GW, and T. C. McMillan, devised a scheme whereby (1) SMSC is sold to GW; (2) GW distributes SMSC in liquidation to its shareholders, the McMillan family trusts; (3) the trustee, ABC, sells SMSC and the other properties of GW to PPP in return for assumption of various outstanding deeds of trust and for a large promissory note; (4) ABC sells the promissory note to WM, solely for tax reasons; and (5) PPP pays "interest" and principal to WM. Respondent states that the reason for this scheme was to permit PPP to deduct its interest payments and its inflated depreciation expenses from its net income and the partners of PPP to offset their incomes from the practice of medicine and other professions by their share of the losses of PPP. Respondent asserts that this "scheme" of Harry Margolis constitutes a deliberate and calculated disregard of his rules and regulations and calls for the application of a 5 percent addition *332 to tax under section 6653(a). 30 Respondent denominates GW as a "dying conduit" and urges that we disregard the sale by Pacific Lenders to GW and view the transaction as a sale by Pacific Lenders to PPP.
Petitioners contend that respondent in his attempt to show that the "substance" of the purchase by PPP was different from the "form" of the transaction has ignored the agreed facts.
We agree with petitioners that it is difficult to conform respondent's argument in this case to the agreed facts. The agreed facts show that PPP was in no way related to any of the other entities involved with the property transaction. Margolis put the PPP partnership together but he had no ownership in it. PPP actually paid the price it agreed to pay for the properties. If the "intent" was a disguised downpayment, as respondent contends, then the properties actually cost PPP more than it paid for them since all the stated price of the properties was otherwise paid by PPP. However, without explaining this inconsistency respondent contends that the bases of the properties to PPP are less than PPP paid for the properties even without adding the "interest" to the price otherwise paid. Since *333 31 generally a taxpayer's basis in a property is its cost to him, if in fact the "interest" were a downpayment on the properties, it would be part of the cost to PPP of the properties and part of PPP's basis in the properties.
There are also other difficulties in adopting respondent's view. PPP was not formed at the time Pacific Lenders conveyed the SMSC to GW. This fact is not insurmountable because it might be assumed that Margolis and Fischel could have gathered together the members of PPP in late 1966 rather than wait until April 1967. Of more importance, however, is the fact that Pacific Lenders needed over $650,000 in cash to pay off Southwest Capital. By the end of 1967, PPP's capital contributions totaled only $402,500 and of this amount almost $140,000 was borrowed from either ADC or from Margolis personally. There is a genuine doubt as to whether PPP could have raised the $682,000 which GW tendered to Pacific Lenders.
A second major problem with respondent's theory is that he overlooks or downplays GW's position as the major shareholder of Pacific Lenders. It is clear that GW's decision to purchase SMSC was made in part 32 to protect its position as a *334 shareholder of Pacific Lenders. Had Southwest Capital foreclosed on SMSC and sold SMSC to satisfy the interest of Southwest Capital, it is quite likely that GW would have ended up as the majority shareholder of a bankrupt corporation. By purchasing SMSC, GW was able to salvage a bit of its investment in Pacific Lenders although it agreed to give up all rights to any participation in the proceeds of the bankruptcy of Pacific Lenders.
Although the record shows that Pacific Lenders would have sold SMSC to buyers other than GW, and it may be assumed would have sold SMSC to PPP if PPP had been in existence, none of these potential purchasers could obtain the necessary amount of cash to buy off Southwest Capital. GW was able to do so.
Respondent asserts that there was no business reason for GW to acquire SMSC at a time when its owners and managers had decided to carry out a plan for its liquidation. Petitioner responds with the simple contention that GW saw an opportunity to make a profit by taking advantage of its ability to obtain the needed cash to buy SMSC and to resell SMSC under terms which would benefit both GW and the buyers of SMSC. Moreover, the record is clear that GW had *335 a critical need for profits at the time it purchased 33 and sold SMSC. This need for profit is ample justification for GW to purchase SMSC.
From the facts here present we find that GW had a legitimate business reason to purchase SMSC and to do so gave up over $650,000 in cash as well as assuming outstanding mortgages against SMSC. The total purchase price was $3,100,685. Following the distribution of the GW assets, including SMSC to the McMillan family trusts, ABC, the trustee of these trusts, was willing to sell SMSC under a no-money-down plan but demanded in return for such favorable terms a sales price of $4,050,000, and on the promissory note which PPP executed in favor of ABC for $1,651,729.75, demanded an annual interest rate of 10 percent.
Even assuming that SMSC is a "white elephant" as respondent asserts on brief and worth no more than a cash price of $3,100,000, it cannot be overlooked that the sales price paid by PPP was a price that required no cash downpayment. Since the record is clear that PPP was not related to either GW, Pacific Lenders, or any other McMillan interest, it may be assumed that PPP would have preferred to have obtained SMSC for $3,100,685, *336 the sales paid by GW, if PPP could have purchased it at that price with no downpayment. 34 ABC of course would not agree to such a sale and was able to extract almost a $1,000,000 gain for the McMillan trusts as a result of its ability to sell on no downpayment terms.
Respondent contends that the instant case bears a marked resemblance to and should be controlled by our holding in Mark Bixby, 58 T.C. 757 (1972). In that case, the Converse Rubber Company wished to acquire the assets of Tyer Rubber Company. Instead of purchasing an option to buy the Tyer assets, Converse had certain previously existing Bermuda trusts, which were either related to or under the control of Converse, acquire the option for $63,500. The Bermuda trusts immediately sold the option to Converse for $1.6 million worth of 10-year, highly subordinated debentures. Converse then exercised the option, sending a check for $1,800,000 to Tyer in exchange for the assets. Converse included the $1.6 million in its cost basis for the Tyer assets and used this increased figure for the purpose of computing depreciation. We held that the purchase of the option by the Bermuda trusts was a sham in the *337 sense that the real purpose of the transaction, taken as a whole, was to effect a purchase of the option by Converse and that the $1.6 million face 35 value of debentures could not be included in Converse's cost basis of the assets.
Respondent's reliance on Mark Bixby, supra, is misplaced. That case is clearly distinguishable on its facts from the instant case. In the Bixby case the parties to the purchase and sale of the Tyer option were related and we found they connived in a sham transaction to have the Bermuda trusts first acquire the option. Here, PPP was not related to GW or Pacific Lenders and this transaction whereby PPP purchased the properties of GW was not a sham and PPP paid the purchase price.
Respondent's real complaint is that the gain realized by GW will go untaxed by the United States since GW was in liquidation when the sale of SMSC was made and its shareholder, the McMillan family trust, was a Bahamian trust administered by a Bahamian trust company (ABC), and that the interest paid by PPP to World Minerals will go untaxed because WM is a Netherlands Antilles corporation and the treaty of the United States with the Netherlands Antilles so *338 provides. If there were evidence which would show that PPP and GW or the McMillan trusts or ABC were acting in connivance, then the Bixby rationale would be applicable. 36 The facts, however, do not show any such connivance. Respondent insists that Margolis is the common link. Although his then-associate, Elaine B. Fischel, did serve as agent or trustee of ABC during the conveyance of the GW properties to PPP, Margolis clearly warned each of the members of PPP that he was representing GW and that each should seek independent counsel. We do not find Margolis to be the common element in exact entity as respondent contends. We find that PPP properly deducted the interest paid on its note to WM and that the basis of SMSC to PPP is as claimed, $4,050,000.
With respect to the other GW properties acquired by PPP from the McMillan family trusts on April 1, 1967, the record shows that PPP paid $40,000 for the Palm Desert residence and resold it in 1970 for $45,000. There is nothing to suggest why PPP should not be permitted to use its cost of $40,000 as its basis for this property. The agreement made by PPP to allow Edna McMillan to continue to live in the residence until her *339 death does not diminish the value of the property to such an extent as to make the $40,000 price unrealistic. PPP correctly reported the basis of this property as $40,000. 37 The property referred to as 1317 S. Gramercy was purchased by GW in 1966 for $40,000. GW renovated the building which had served as a residence, converting it into a convalescent hospital. GW leased the newly renovated building to Nator, Inc., which agreed to pay $700 per month rent for 5 years. GW sold the building to PPP for $68,752.24 on April 1, 1967. PPP sold the building in 1969 for $86,000.# These facts refute respondent's contention that PPP may claim as a basis for this property only $40,000. These facts do not show that PPP paid an excessive amount for this property, but rather suggest that PPP obtained a good value when it purchased this property. PPP correctly reported as its basis for this property its cost of $68,752.24.
In concluding as we have, we have assumed as respondent contends that the partners in PPP were motivated in investing in the partnership by the tax advantages to be derived from the interest and depreciation deductions available to taxpayers who purchase improved *340 real property with borrowed funds. This, however, is not because of the sale of the properties by GW to PPP but because the law permits such deductions. We have likewise assumed that ABC transferred the note it received 38 from PPP in part payment of the properties to WM and was able to make an advantageous transfer of this note because under the tax treaty between the United States and the Netherlands Antilles WM was not required to pay United States income tax on the interest it received on the note. This, however, is likewise a tax advantage given by law to a Netherlands Antilles corporation. If these tax advantages are "loopholes," the problem is one for Congress and not the courts.
Having decided that PPP correctly reported on its partnership income tax return the bases in the various GW properties it acquired on April 1, 1967, from the McMillan family trusts, we necessarily find that petitioners did not intentionally or negligently violate any rules or regulations with respect to the issue in contention. Accordingly, we find that petitioners do not owe an addition to tax under section 6653(a).
To give effect to the many issues which were agreed upon,
Decision will *341 be entered under Rule 155. Footnotes
1. This amount, which is obviously more than the total of the individual items, is a stipulated figure. ↩
1. Borrowed from Harry Margolis rather than from ADC↩
2. Deceased ↩
2. All references are to the Internal Revenue Code of 1954.↩